# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John F. Grady | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 4693 | **DATE** | August 27, 2003 |
| **CASE TITLE** | Microsoft v. V3 Solutions and Vaia | | |

**MOTION:**
[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the foregoing reasons, plaintiff's motion for summary judgment [16-1] is granted in part and denied in part. The motion is granted as to Counts I and II. It is granted as to the portions of Counts IV, V, and VI relevant to the counterfeit software, but denied as to the portions of those counts relevant to the WWF CDs. Microsoft may file a memorandum by September 10, 2003, showing cause why we should not enter summary judgment for defendants on these counts in relation to the WWF CDs. Plaintiff's motion for summary judgment is denied as to Counts III, VII, and VIII of the complaint. The court awards Microsoft statutory damages of $5,000 for each of its seven registered trademarks that defendants infringed by virtue of distributing counterfeit software, and $5,000 for each of its seven registered copyrights that defendants infringed, for a total statutory damage award of $70,000. The court grants Microsoft's request for costs and attorney's fees, and the parties are directed to attempt to agree on an amount pursuant to Local Rule 54.3 and as set forth supra. In the event that the filing of a fee petition is necessary, the petition should be filed no later than September 29, 2003, and defendants may respond by October 13, 2003. ENTER MEMORANDUM OPINION.

(11) x [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| X | Notices MAILED by judge's staff. | U.S. DISTRICT COURT CLERK | AUG 2 8 2003 | |
| | Notified counsel by telephone. | 03 AUG 27 PM 5: 18 | date docketed | 28 |
| | Docketing to mail notices. | FILED FOR DOCKETING | | |
| | Mail AO 450 form. | 1:03 | docketing deputy initials | |
| | Copy to _____ | | 8/27/03 | |
| | | | date mailed notice KAM | |

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MICROSOFT CORPORATION, a<br>Washington corporation, | ) ) ) | **DOCKETED**<br>AUG 2 8 2003 |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 01 C 4693 |
| V3 SOLUTIONS, INC., an Illinois<br>corporation, and MIKE VAIA,<br>an individual, | ) ) ) ) | |
| Defendants. | ) ) | |

### MEMORANDUM OPINION

Before the court is Microsoft Corporation's motion for summary judgment. For the following reasons, the motion is granted in part and denied in part.

### BACKGROUND

Plaintiff Microsoft Corporation ("Microsoft") brings this copyright and trademark infringement action against defendants V3 Solutions, Inc. ("V3") and Mike Vaia, alleging the unauthorized distribution of Microsoft software. The undisputed facts are as follows.

#### *Plaintiff and the Copyrights and Trademarks at Issue*

Plaintiff Microsoft is a Washington corporation that develops, advertises, markets, distributes, and licenses computer software.

28

Its software is distributed in all fifty states and throughout the world.

Microsoft owns valid copyrights in several software programs relevant to this action: Microsoft Office 2000 Professional (Registration Number TX 4-905-936), Microsoft Access 2000 (TX 4-905-950), Microsoft Excel 2000 (TX 4-905-949), Microsoft Outlook 2000 (TX 4-906-019), Microsoft PowerPoint 2000 (TX 4-905-952), Microsoft Publisher 2000 (TX 4-905-937), Microsoft Word 2000 (TX 4-905-951), Microsoft Office 97 (Professional Edition) (TX 4-395-984), Microsoft Access 97 (TX 4-395-639), Microsoft Excel 97 (TX 4-395-640), Microsoft Outlook 97 (TX 4-395-686), Microsoft PowerPoint 97 (TX 4-395-685), and Microsoft Word 97 (TX 4-395-687).[1]  These copyrights were registered in compliance with the Copyright Revision Act of 1976, 17 U.S.C. § 101 et seq., and Copyright Office regulations.

---

[1] It is not important for purposes of this motion to describe the function of each software program.  Suffice it to say that the programs allow users to create such things as databases, spreadsheets, calendars, slide presentations, reports, and documents.  Microsoft Office 2000 Professional is suite or a collection of programs, including the 2000 versions of Microsoft Access, Excel, Outlook, PowerPoint, Publisher, and Word. Microsoft Office 97 is a collection of programs, including the 1997 versions of Access, Excel, Outlook, PowerPoint, and Word.

Microsoft is also the owner of the following valid registered trademarks: "MICROSOFT" for computer programs and computer programming services (Trademark and Service Mark Registration Number 1,200,236); "MICROSOFT" for computer hardware and software manuals, newsletters, and computer documentation (Trademark Reg. No. 1,256,083); Windows Flag Logo for computers, computer peripherals, and computer programs and manuals sold as a unit (Trademark Reg. No. 1,816,354); "WINDOWS" for computer programs and manuals sold as a unit (Trademark Reg. No. 1,872,264); Colored Windows Logo for computers, computer peripherals, and computer programs and manuals sold as a unit (Trademark Reg. No. 1,815,350); Puzzle Piece Logo for computer programs and instruction manuals sold as a unit (Trademark Reg. No. 1,982,562); "POWERPOINT" for pre-recorded computer programs recorded on magnetic disks (Trademark Reg. No. 1,475,795); "MICROSOFT ACCESS" for computer programs for use with databases and manuals sold as a unit (Trademark Reg. No. 1,741,086); "OUTLOOK" for computer programs, namely programs providing enhanced electronic mail and scheduling capabilities and instructional manuals sold as a unit (Trademark Reg. No. 2,188,125); and "WINDOWS NT" for computer programs, namely operating system programs including an operating environment and

instructional manuals sold as a unit (Trademark Reg. No. 1,955,219).

Microsoft distributes its software for installation or distribution in the retail chain to end users as a package of components, which includes CD-ROM(s) or diskettes(s), an end-user license agreement ("EULA"), a user's manual, a Certificate of Authenticity, and a registration card.   Microsoft does not distribute and has not distributed its software into the retail chain of distribution without these components.

Microsoft operates a discount volume licensing program called the Microsoft Open License Program ("MOLP"). Pursuant to the MOLP, an individual or business can obtain licenses from an authorized Microsoft reseller that entitle the licensee to operate specified Microsoft software at a specified number of computer workstations. Microsoft provides its MOLP customers with a license agreement that designates the type of software a MOLP licensee may obtain and the number of workstations on which the software may be loaded.

MOLP licensees are entitled to participate in Microsoft's World Wide Fulfillment ("WWF") program.   Under the WWF program, MOLP licensees can buy CDs containing copies of particular software.   The CDs are available at a low price because the MOLP licensees have already paid for their licenses; the CDs simply serve as the means--the specific media--by which they can use the

licenses. The WWF program was developed for customers' convenience as an easy way to install licensed software and obtain back-up copies. MOLP licensees are entitled to "fulfill" their license up to the number of workstations specified in the license. When ordering CDs from the World Wide Fulfillment Center, the buyer uses a Volume License Number obtained when the license was purchased. Institutions typically do not want many WWF CDs. Microsoft provides those institutions with just the number of CDs they need in order to install and operate their systems; this could be just a few CDs for hundreds of users. The WWF CDs as well as the CD case liners bear a legend stating that they are not for retail distribution.

### _Defendants and the Allegedly Infringing Activity_

Defendant V3 is an Illinois corporation that sells and distributes computer hardware and software. Defendant Mike Vaia is the sole officer and director of V3 and owns 100% of the corporation. Over time, V3 has employed a varying small number of employees totaling no more than four or five. Vaia personally manages the day-to-day operations of V3 and has primary responsibility for its software acquisitions. During the time period relevant to the complaint, V3 conducted business out of

Vaia's home in Wood Dale, Illinois, and (since June 2000) from office space in Elmhurst, Illinois.[2]

From May 1998 to early 1999, prior to owning and operating V3, Vaia was the "technical coordinator" for St. Viator High School ("St. Viator") in Arlington Heights, Illinois. (However, Vaia was not a school employee, nor was he on the school's payroll.) As technical coordinator, Vaia was responsible for maintaining the school's computer network and providing technical support. Until early 2000, Vaia continued a service relationship with St. Viator. During this time, V3 provided technical services to the school, including having a V3 employee on-site at St. Viator who procured technology products for the school.

On October 22, 1999, law enforcement officials from the Wood Dale, Illinois Police Department and the Illinois Attorney General's Office executed a criminal search warrant at Vaia's home in Wood Dale. Police officers seized a substantial number of Microsoft WWF CDs as well as various counterfeit copies of Microsoft software.[3] Thus, there are two categories of software

---

[2] V3 also conducts business on the Internet under the name V3PC.com.

[3] Police officers also seized defendants' business records. Those records have been and continue to be in the custody of the Wood Dale Police Department. Microsoft subpoenaed and obtained the records from the Wood Dale Police Department, and then provided defendants with copies of the documents received. The documents are Bates stamped with the prefix "WDPD."

seized from V3 at issue in this case: (1) the WWF CDs; and (2) counterfeit software.

### *The WWF CDs*

Microsoft alleges that in the three years prior to the filing of its complaint, defendants were involved in a "large-scale" distribution of WWF CDs, which Microsoft considers to be infringing. Microsoft states that in September 1999, it obtained information that Vaia was ordering excessive quantities of Microsoft software through the WWF program.

According to Microsoft, the software orders were placed by Vaia in the name of St. Viator High School. St. Viator had anywhere from 80 (St. Viator's estimate) to 150 (Microsoft's estimate) computers. Vaia had registered St. Viator in Microsoft's MOLP for three licenses that allowed St. Viator to install a total of 750 units of software on St. Viator's workstations. One license, issued May 13, 1999, was for 150 units of Microsoft Office 97 (Professional Edition). Another license for 100 units of the same product was issued on May 25, 1999. The third license, for 500 units of Microsoft Office 2000 Professional, was issued on July 16, 1999.

The first time software was ordered in St. Viator's name (with Vaia as the contact person listed on the invoice), 400 WWF CDs

containing Microsoft Office 97 (Professional Edition) were ordered. Microsoft contends that Vaia continued to order "excessive" quantities of software through St. Viator's licenses, totaling at least 17,121 units of software. Vaia was the only person at V3 who was responsible for obtaining software through the WWF program.

While Vaia admits that he obtained a large number of Microsoft WWF CDs and that the CDs were not for St. Viator, he claims that Microsoft erred in that Vaia's software orders for V3 were mistakenly associated with those of St. Viator. Vaia's explanation is that the licenses obtained through the MOLP were really for V3 and not for any particular customer of V3, but were incorrectly labeled as "being owned by the St. Viator school." (Defendants' Response to Plaintiff's Statement of Material Facts, ¶¶ 52-57, 61, 62, 69; Declaration of Michael Vaia, ¶ 11.) He states that "[a]ttempts were made by V3 to have the name on the licenses changed to properly reflect ownership by V3 Solutions," although he does not describe these "attempts." (Id.) Vaia states that V3 used the licenses to purchase WWF CDs from Microsoft-authorized distributors and resold the CDs to other resellers or "brokers" and not end users. V3 bought the WWF CDs for about $15 each and resold them to other resellers for between $50 and $60 each. V3's gross

revenue for distributing the approximately 17,121 units of Microsoft software was $887,264.25.

Microsoft maintains that the error that Vaia asserts took place was not possible because when software is ordered through the WWF program, the required authorization number must be provided in order to confirm that the party ordering the software has a license for it. According to Microsoft, Vaia must have provided the license number for St. Viator when he ordered the software; otherwise, he would not have been able to obtain the software. Vaia himself did not have a license that would allow him to obtain WWF CDs.

At the time Vaia was a technology consultant to St. Viator, the school possessed at most two copies of the Microsoft Office 97 (Professional Edition) CD. Today, St. Viator has approximately 200 personal computers (excluding Macintosh computers), and over the past year the school has acquired 230 additional licenses for Microsoft Office. St. Viator currently has only one CD-ROM each of Microsoft Office 95, Microsoft Office 97, Microsoft Office XP, and three or four CDs of Microsoft Office 2000 Professional.

### *The Counterfeit Software*

#### *Software Seized During the Execution of the Search Warrant*

According to Microsoft, "large quantities of counterfeit and/or infringing Microsoft Software CDs were found" at Vaia's residence (out of which he was conducting V3's business) when the search warrant was executed. (Plaintiff's Statement of Material Facts, ¶ 92.) However, Microsoft fails to specify exactly how many <u>counterfeit</u> copies (as opposed to the WWF CDs, which Microsoft contends are "infringing") were found. Regarding the number of units seized that were actually <u>identified</u> as counterfeit, Microsoft submits the declaration of Tamara Sellers, a Microsoft employee specializing in the detection of software piracy. Sellers states:

> On December 9, 1999, at the Wood Dale Police Department, in Wood Dale, Illinois, I examined Microsoft software that, based on representations from officers of the Wood Dale Police Department, had been seized from the residence of Mike Vaia during the execution of a search warrant on or about October 22, 1999. I found that the software provided to me for analysis included: twenty-one units of counterfeit Microsoft Office 97 Professional Edition ("Office Pro 97") software components, one unit of counterfeit Microsoft Office Pro 97 software, and one hundred counterfeit Microsoft Office Pro 97 End User License Agreements ("EULAs").

(Appendix in Support of Microsoft's Motion for Summary Judgment, App. 3, Declaration of Tamara Sellers, ¶ 15.) Several things are unclear from a review of this paragraph: how much software was

actually seized; whether Sellers was "provided" with all of the seized software (and if not, how much of it she was provided with); what the distinction is between Office Pro 97 software "components" versus "software"; which "components" were counterfeit; and how Sellers came to the conclusion that the components, software, and EULAs were counterfeit.

Vaia testified that in order to determine whether software is counterfeit, one would have to open the software and thoroughly inspect it. Still, said Vaia, V3 trains its employees about the risks of counterfeit software and instructs them to take precautions to avoid acquiring counterfeit software. Vaia stated that V3 acquired small quantities of counterfeit software on occasion and would either send it back to the vendor or keep it for reference purposes in a box marked "Counterfeit" or "Do Not Resell."

Vaia stated that he would sometimes refer to Microsoft's piracy web site in order to determine whether certain software was counterfeit. In addition, he would rely on industry word-of-mouth and past experience to avoid working with vendors who had sold counterfeit products. Another factor that defendants used to determine "good" sources for software included the perceived genuineness of samples V3 received, but the primary considerations

for choosing software suppliers were price and availability of certain titles. Other than the WWF CDs discussed _supra_, defendants did not acquire software from Microsoft-authorized distributors because of price. Vaia described those distributors' prices as "too close to retail." Vaia admitted that in investigating suppliers, sometimes suppliers were not as forthcoming as he would like. In addition, some of the vendors from which defendants bought software did not always provide invoices and appeared to be lax in recordkeeping. (Appendix in Support of Microsoft's Motion for Summary Judgment, App. 4, Transcript of Deposition of Michael Vaia.)

After the search warrant was executed, defendants began "actively searching" for new suppliers for Microsoft products. On March 9, 2000, V3 received a warning letter from Microsoft stating that "Microsoft has received a report that you may have distributed illegal and/or unlicensed Microsoft software products." (_Id._, Ex. 12.) The letter did not describe any specifics.

_Other Counterfeit Software_

On March 6, 2000, an investigator hired by Microsoft ordered two units of Microsoft Office 97 (Professional Edition) and two units of Microsoft Office 2000 Professional from V3. On March 10, the investigator received a package containing the software, opened

the package and inspected its contents, and then repackaged and shipped the software to Microsoft. (<u>Id.</u>, App. 10, Declaration of Robert Holmes.) Microsoft analyzed the software it received from the investigator and determined that it was counterfeit. (<u>Id.</u>, App. 3, Declaration of Tamara Sellers, ¶¶ 16-18.)

On March 14, 2001, another investigator hired by Microsoft ordered two units of Microsoft Office 97 (Professional Edition) from V3. The investigator received the software on March 15, opened it and labeled the software, and then shipped the software to Microsoft. Sellers examined this software as well and concluded that it was counterfeit. (<u>Id.</u>, ¶¶ 21-25.)

In addition, one of V3's customers, Kasper Machine Co. ("Kasper"), ordered 38 copies of Microsoft Office 2000 Professional from V3 on June 1, 2001. On June 11, Kasper sent one copy of the software it received from V3 to Microsoft. Sellers determined that the software sample was counterfeit. (<u>Id.</u>, ¶¶ 26-28.)

### *This Action*

Microsoft filed this action on June 20, 2001. The complaint alleges copyright infringement due to the distribution of counterfeit software (Count I); trademark infringement due to the distribution of counterfeit software (Count II); trademark infringement due to the unauthorized distribution of the WWF CDs

(Count III); false designation of origin due to both types of conduct (Count IV); violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Count V); and state-law unfair competition (Count VI). In the complaint, Microsoft also seeks the imposition of a constructive trust (Count VII) and an accounting (Count VIII).

Microsoft has now moved for summary judgment.

## DISCUSSION

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court will enter summary

judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." McGrath v. Gillis, 44 F.3d 567, 569 (7th Cir. 1995).

As explained supra, there are two types of software at issue in this case: (1) the WWF CDs; and (2) counterfeit software. We will analyze each type of software separately.

## A. **The WWF CDs**

Counts III and IV of the complaint allege that defendants' unauthorized distribution of improperly obtained WWF CDs constitutes trademark infringement and false designation of origin under the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a). Microsoft argues that the distribution created a likelihood of confusion among prospective purchasers and falsely indicated affiliation, sponsorship, or approval by Microsoft.

Section 1114(1) of the Lanham Act provides in pertinent part:

(1) Any person who shall, without the consent of the registrant--(a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided.

Section 1125(a) of the Lanham Act provides in pertinent part:

> Any person who . . . uses in commerce any word, term,
> name, symbol, . . . or any combination thereof, or any
> false designation of origin, false or misleading
> description of fact, or false or misleading
> representation of fact, which--(A) is likely to cause
> confusion, or to cause mistake, or to deceive as to the
> affiliation, connection, or association of such person
> with another person, or as to the origin, sponsorship, or
> approval of his or her goods, . . . shall be liable in
> a civil action by any person who believes that he or she
> is or is likely to be damaged by such act.

To prevail on a claim under either section, a plaintiff must show that (1) it has prior protectible rights in the trademark; and (2) defendant used the mark in commerce in a way that was likely to cause confusion among the relevant group of buyers. See _Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc._, 128 F.3d 1111, 1115 (7th Cir. 1997); _Forum Corp. of N. Am. v. Forum, Ltd._, 903 F.2d 434, 439 (7th Cir. 1990).

It is undisputed that Microsoft owns the federally registered trademarks set forth _supra_ and that the federally-registered marks are legally protectable. Defendants contend, however, that trademark law does not apply to the sale of genuine goods bearing a true mark, even if the sale is without the trademark owner's consent. (Defendants' Response at 6, citing _NEC Electronics v. CAL Circuit Abco_, 810 F.2d 1506 (9th Cir.), _cert. denied_, 484 U.S. 851 (1987).) The court in _NEC Electronics_ explained this rule and its rationale as follows:

>Trademark law generally does not reach the sale of
>genuine goods bearing a true mark even though such sale
>is without the mark owner's consent. Once a trademark
>owner sells his product, the buyer ordinarily may resell
>the product under the original mark without incurring any
>trademark law liability. The reason is that trademark
>law is designed to prevent sellers from confusing or
>deceiving consumers about the origin or make of a
>product, which confusion ordinarily does not exist when
>a genuine article bearing a true mark is sold.

810 F.2d at 1509 (citations omitted).

Microsoft does not claim that the WWF CDs sold by defendants are physically different from those bought and sold in a manner that Microsoft deems "authorized." But Microsoft does argue that the WWF CDs are just one component of the MOLP package, the totality of which constitutes the "genuine product." A stand-alone WWF CD, according to Microsoft, is not "genuine" for purposes of the Lanham Act--even if it is manufactured by an authorized source- -because it is not distributed along with a user manual, a certificate of authenticity, and an end-user license agreement. Defendants, on the other hand, contend that Microsoft _itself_ distributes the WWF CDs in a stand-alone fashion; the WWF CDs can be ordered after the licensee receives the initial MOLP package with the software, license agreements, manuals, etc., and the WWF CDs do not come with any other components. Thus, defendants assert that the WWF CDs were "genuine" Microsoft products.

Microsoft relies on two cases in support of its argument. The first is <u>Shell Oil Co. v. Commercial Petroleum, Inc.</u>, 928 F.2d 104 (4th Cir. 1991). In <u>Shell Oil</u>, the Court of Appeals affirmed the district court's holding that the defendant infringed Shell's trademark by failing to observe Shell's stringent quality control requirements when marketing bulk oil. Those requirements insured that Shell oil was not contaminated by residuals in distributors' tanks, tanker trucks, and pumps as it made its way to consumers. <u>See</u> <u>id.</u> at 106-07. The court stated that "[a] product is not truly 'genuine' unless it is manufactured and distributed under quality controls established by the manufacturer. . . . The actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain." <u>Id.</u> at 107 (internal quotation marks omitted). According to the court, the bulk oil sold by defendant was not truly "genuine" without Shell's enforcement of its quality controls.

The facts of the other case Microsoft relies upon, <u>Novell, Inc. v. Weird Stuff, Inc.</u>, No. C92-20467, 1993 U.S. Dist. LEXIS 6674 (N.D. Cal. May 14, 1993), are much more similar to the instant case. Defendant Weird Stuff, a software reseller, bought (from an unauthorized reseller) 1700 "system disks" that were originally part of a multi-disk computer program called NetWare, manufactured

by Novell. The unauthorized reseller had obtained the disks by "dumpster diving" at Novell's manufacturing facility. Weird Stuff then sold the NetWare system disks; subsequently, Novell sued Weird Stuff for copyright and trademark infringement and false designation of origin.

Weird Stuff argued that the disks were genuine because they had been manufactured according to Novell's specifications and were not discarded because of any defects. Novell contended that the disks were not genuine because they could not operate the NetWare program on their own; a user would need the additional twenty-plus additional disks customarily sold as part of the NetWare package.

It was undisputed that the system disks were not normally distributed by themselves and could not operate the NetWare program on their own, and that the NetWare package always came with instruction manuals. Defendant sold the system disk alone without the other accompanying disks and manuals. Given these facts, the court found that the disks lost their "genuineness" when they were separated from the NetWare package and tossed in the garbage, and held that a reasonable jury could not find that the disks were "genuine" Novell products. 1993 U.S. Dist. LEXIS 6674 at *32.

Both cases cited by Microsoft are distinguishable. As noted by the court in <u>Matrix Essentials, Inc. v. Emporium Drug Mart,</u>

Inc., 988 F.2d 587, 591 (5th Cir. 1993), <u>Shell Oil</u> involved a
"defect (or potential defect) in <u>the product itself</u> that the
customer would not be readily able to detect. . . . due to the
unauthorized distributor's failure to observe the manufacturer and
mark owner's rigorous quality control standards."[4]  Moreover, "a
consumer would not necessarily be aware of the defective condition
of the product and would thereby be confused or deceived."  <u>Id.</u>
Here, there was nothing wrong with the WWF CDs themselves, nor were
there any potential defects in the CDs as a result of being shipped
or handled improperly.

The facts of this case are different from those of <u>Novell</u> as
well.  The system disks in <u>Novell</u> had been separated from the rest
of the package that they normally came with and thrown in the
trash.  In addition, the system disks alone would not operate the
NetWare program.  Here, the WWF CDs were not separated from

_____

[4]    In <u>Matrix Essentials</u>, the court affirmed the entry of summary
judgment for defendant on plaintiff's trademark infringement claim.  Plaintiff's
theory was that defendant, which was a store and not a beauty salon, was not
selling "genuine" hair care products because it was selling them without the
professional consultation that was supposed to be available.  The court found
that there was no evidence of consumer confusion or deception: "[n]o customer who
went to [defendant's store] to buy [plaintiff's] products was confused or
deceived as to whether they were getting a cosmetologist's consultation with
their purchase."  988 F.2d at 591.  The court also noted: "We cannot ignore the
fact that if a pre-sale consultation is a necessary part, in Matrix's opinion,
of a 'genuine' Matrix product, then many of the sales that occur in salons are
not sales of 'genuine' Matrix products either.    Thus, Matrix's use of
professional hair care salons as its exclusive distribution channel seems more
marketing-related than quality-related."  <u>Id.</u> at 592.  We believe that
Microsoft's claim that the instruction manual and other materials  are a
necessary part of its software product is much like Matrix's claim that the
consultation was a necessary part of its hair-care product.

anything; in fact, Microsoft itself provided the WWF CDs by themselves to MOLP customers. There is also no evidence that the WWF CDs alone would not operate the programs that they contained.

The parties have framed the issue as being whether the product sold by defendant was "genuine." This inquiry is complicated by the fact that the parties define the product differently: defendants say that the product was the WWF CDs, while Microsoft says that the product was the entire MOLP package, of which defendants were merely selling one component. Microsoft's argument is somewhat curious given that Microsoft itself distributed the WWF CDs on a stand-alone basis. Apparently, Microsoft contends that it only distributed the CDs to those customers who, by virtue of enrolling in the MOLP, already had the instruction manuals, certificates of authenticity, and end-user agreements. Microsoft fails to submit any evidence showing that defendants' customers did not have the same materials, or that the materials are so crucial that the program cannot be operated without them.[5] In any event, from our review of the relevant case law, the identification of the "product" is somewhat of a red herring in that it takes us away from the true focus of trademark law: consumer confusion. We must

---

[5]     Many computer programs, including those of Microsoft, contain a "help" feature that users can consult instead of referring to a printed instruction manual, or a link to a web site containing the same information as a printed instruction manual.

ask whether those who purchased the WWF CDs from defendants would be confused or deceived about the source, sponsorship, or origin of the CDs.

Microsoft has failed to present evidence demonstrating a likelihood of confusion or demonstrating how the quality of its software or its goodwill was affected by defendants' distribution of the stand-alone WWF CDs. We believe that the mere distribution by defendants of unadulterated Microsoft WWF CDs is insufficient to establish trademark infringement. See Adobe Systems Inc. v. One Stop Micro, Inc., 84 F. Supp. 2d 1086, 1094 (N.D. Cal. 2000) (denying plaintiff's motion for summary judgment on trademark infringement claim where defendant resold unadulterated copies of software). Accordingly, Microsoft's motion for summary judgment will be denied as to Count III of the complaint and as to Counts IV-VI of the complaint insofar as they apply to the activity relating to the WWF CDs. It appears that summary judgment for defendants would be appropriate on these counts in relation to this conduct. Defendants have not moved for summary judgment, but there would be no point in trying these claims if, as a matter of law, plaintiff could not prevail. Therefore, we will give Microsoft leave to file a memorandum, if it wishes, showing cause why we should not enter summary judgment for defendants.

**B. The Counterfeit Software**

### 1. Copyright Infringement

Count I of the complaint alleges that defendants' distribution of counterfeit Microsoft software constitutes copyright infringement under the Copyright Act, 17 U.S.C. § 502 et seq. To establish copyright infringement, the plaintiff must demonstrate that (1) he owns a valid copyright; and (2) the defendant copied the protected work. See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991). Neither lack of knowledge nor intent are defenses to a copyright infringement claim; rather, state of mind is relevant to the determination of damages and attorney's fees. See Fitzgerald Publ'g Co. v. Baylor Publ'g Co., 807 F.2d 1110, 1113 (2d Cir. 1986); Microsoft Corp. v. Logical Choice Computers, Inc., No. 99 C 1300, 2001 WL 58950, at *8 (N.D. Ill. Jan. 22, 2001).

A certificate of copyright registration constitutes prima facie evidence of the validity of a copyright. See 17 U.S.C. § 410(c). This is a rebuttable presumption. See Mid America Title Co. v. Kirk, 59 F.3d 719, 721 (7th Cir. 1995). Defendants admit that Microsoft registered the above-listed copyrights with the United States Copyright Office; this is prima facie evidence that Microsoft owns valid copyrights in the software. Thus, there is no

dispute that the first element of copyright infringement is satisfied.

Microsoft can prove the second element of copyright infringement, "copying," by showing that defendants violated any of its exclusive rights as copyright holder. See 17 U.S.C. § 501(a); Logical Choice Computers, 2001 WL 58950, at *8. Microsoft's exclusive rights include the right to reproduce its software in copies and to distribute those copies to the public. See 17 U.S.C. § 106(1), (3).

As stated supra, Microsoft submits the declaration of Tamara Sellers, a Microsoft employee who specializes in the detection of software piracy. Sellers analyzed portions of four different lots of software either taken from or sent by V3 and determined that they contained counterfeit units: (1) the software seized from V3 pursuant to the search warrant; (2) software sent by V3 to a Microsoft investigator in March 2000; (3) software sent by V3 to a Microsoft investigator in March 2001; and (4) software sent by V3 to its customer, Kasper, in June 2001.

Regarding the software seized from V3 by the Wood Dale police, Microsoft's (and Sellers's) conclusion that certain units of it were counterfeit is wholly conclusory and insufficient to support summary judgment. As noted supra, Sellers's declaration provides

no basis for her conclusion that 21 units of counterfeit "components" of Microsoft Office 97 (Professional Edition), 1 unit of counterfeit Microsoft Office 97 software, and 100 counterfeit EULAs were found on defendants' premises.

Sellers's declaration does, however, provide a detailed basis for her conclusion that the rest of the software at issue was counterfeit: 2 units of Microsoft Office 97 (Professional Edition) and 2 units of Microsoft Office 2000 Professional that were obtained by Microsoft's investigator in March 2000; 2 units of Microsoft Office 97 (Professional Edition) that were obtained by Microsoft's investigator in March 2001; and 1 unit of Microsoft Office 2000 Professional that was obtained by Kasper in June 2001. Attached to Sellers's declaration are several exhibits demonstrating differences between genuine Microsoft software and the counterfeit software obtained from V3. For example, certain manufacturing codes that are present on genuine Microsoft Office 97 (Professional Edition) CDs are missing from the counterfeit CDs, and the Microsoft logo on the counterfeit CDs has the letters "cro" placed too high, the letters "os" are not touching as they do on a genuine CD, and the "wedge" cutout of the "os" is too small. (Appendix in Support of Microsoft's Motion for Summary Judgment, App. 3, Declaration of Tamara Sellers, ¶ 17b.)

Defendants make a half-hearted attempt to dispute Microsoft's contention that some of the software obtained from V3 was counterfeit. They admit that Microsoft found the software to be counterfeit, but do not admit that it was in fact counterfeit. Nonetheless, defendants fail to submit any evidence that would create a genuine issue of the software's authenticity.

Defendants raise several other weak arguments in order to avoid summary judgment on copyright infringement. They contend that "only a handful of items were actually examined and opined to be counterfeit." (Defendants' Response at 11.) Defendants fail, however, to cite any case in support of a "de minimis" defense to copyright infringement, and we have found none. See <u>Microsoft Corp. v. Grey Computer</u>, 910 F. Supp. 1077, 1085 (D. Md. 1995) ("Even assuming, <u>arguendo</u>, that only one unit was counterfeit, there would still be a violation of the Copyright Act. The Act does not require extensive copying on the part of a defendant before a plaintiff can bring a claim for infringement.")[6]

If defendants mean to imply that Microsoft must show that each and every unit of software was examined and found to be counterfeit, they are incorrect. That is an unreasonably high burden to place on Microsoft. See <u>Grey Computer</u>, 910 F. Supp. at

---

[6] Any sort of "de minimis" defense to copyright infringement occurs in the context of "fair use," a concept which is not at issue here.

1085 ("Defendants attempt to have the Court place an unreasonably high burden on Microsoft to show that each and every unit of software Defendants ever shipped was counterfeit. Microsoft has met its burden by showing that Defendant had access to and copied Microsoft's copyrighted work and that is all it is required to do.")

Defendants argue that Microsoft's findings were based on an elaborate and "almost minute" examination of the software that one could not perform with the untrained eye. After reviewing Microsoft's exhibits containing copies of samples of genuine and counterfeit software, we are unpersuaded. Defendants also assert that Sellers's declaration does not "negat[e] the possibility that the printing issues might also be errors in printing" and that it fails to establish "the chain of possession of the alleged counterfeit products." (Defendants' Response at 12.) Both arguments are based on self-serving conjecture, which is insufficient to create a genuine issue of material fact. Again, defendants fail to submit any evidence that raises an issue as to possible printing errors in genuine software or as to the chain of possession of the counterfeit software.

From Microsoft's submissions, we are satisfied that the software sent by V3 to Microsoft's investigators and V3's customer,

Kasper, and found by Microsoft to be counterfeit, was indeed counterfeit. Therefore, Microsoft is entitled to summary judgment on Count I of the complaint.

### 2.   Trademark Infringement/False Designation of Origin

Count II of the complaint alleges trademark infringement in violation of 15 U.S.C. § 1114(1), and Count IV alleges false designation of origin in violation of 15 U.S.C. § 1125(a), by virtue of defendants' distribution of counterfeit Microsoft software.

### a.   Count II

To prevail on a claim alleging a violation of 15 U.S.C. § 1114(1), Microsoft must prove that (1) it owned valid trademarks in the software at issue; (2) defendants used the same or similar trademarks; (3) defendants' use of the trademarks was unauthorized; (4) defendants used the trademarks "in commerce" in connection with the sale of goods; and (5) the use of the trademarks was likely to cause confusion among the relevant group of buyers as to the origin or sponsorship of the product.   See Logical Choice Computers, 2001 WL 58950, at *8.

Microsoft meets its burden, and defendants fail to raise a genuine issue of material fact in relation to any of the above-listed factors.   It is undisputed that Microsoft owns the federally

registered trademarks set forth <u>supra</u>. Microsoft has submitted unrebutted evidence showing that defendants used the marks in distributing counterfeit software, without Microsoft's consent, to Microsoft's investigators and at least one V3 customer.

As for assessing the likelihood of confusion, the Seventh Circuit generally considers seven factors: "(1) the similarity between the marks in appearance and suggestion, (2) the similarity of the products, (3) the area and manner of concurrent use of the products, (4) the degree of care likely to be exercised by consumers, (5) the strength of the plaintiff's marks, (6) any evidence of actual confusion, and (7) the defendant's intent to palm off its goods as those of the plaintiff's." <u>Promatek Indus.</u> <u>v. Equitrac Corp.</u>, 300 F.3d 808, 812 (7th Cir. 2002). Here, the undisputed evidence is that defendants offered and distributed software that was purportedly Microsoft's which bore imitations of Microsoft's trademarks--representing that the software was genuine when in fact it was not. Likelihood of confusion is established where, as here, goods distributed by a defendant are virtually identical to those of the trademark owner. See <u>Microsoft Corp. v.</u> <u>Compusource Distribs., Inc.</u>, 115 F. Supp. 2d 800, 807 (E.D. Mich. 2000); <u>Logical Choice Computers</u>, 2001 WL 58950, at *9.

Accordingly, summary judgment for Microsoft on Count II is appropriate.

### b. **Count IV**

To obtain summary judgment on its false designation of origin claim pursuant to 15 U.S.C. § 1125(a), Microsoft must demonstrate that (1) defendants used a false designation of origin in connection with goods or services; (2) defendants caused such goods and services to enter into commerce; and (3) plaintiff believes that it will be damaged as a result. See <u>Logical Choice Computers</u>, 2001 WL 58950, at *9 (citing <u>Web Printing Controls Co. v. Oxy-Dry Corp.</u>, 906 F.2d 1202, 1204 (7th Cir. 1990)). To satisfy the third element, Microsoft may show a likelihood of confusion. <u>See id.</u>, 2001 WL 58950, at *9. Our analysis of Count II applies to Count IV; thus, Microsoft is entitled to summary judgment on that part of Count IV that applies to the distribution of counterfeit software.

### 3. **State Law Claims**

In Counts V and VI of the complaint, Microsoft alleges that defendants' activities constituted (1) a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFDBPA"), 815 ILCS 505/1 <u>et seq.</u> and (2) unfair competition under Illinois common law.

Defendants are liable under the CFDBPA if they used or employed "any practice described in Section 2" of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2 (the "UDTPA"). 815 ILCS 505/2. A person engages in "deceptive trade practices" as defined by the UDTPA when he or she "passes off goods or services as those of another" or "causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services." 815 ILCS 510/2.[7] Thus, a defendant can be liable under the CFDBPA if a plaintiff demonstrates a likelihood of confusion. The analysis for an Illinois common-law unfair competition claim is identical. See McGraw-Edison Co. v. Walt Disney Prods., 787 F.2d 1163, 1173 n.9 (7th Cir. 1986); Logical Choice Computers, 2001 WL 58950, at *9.

As discussed _supra_ regarding Microsoft's trademark infringement claims (related to the counterfeit software), Microsoft has demonstrated a likelihood of confusion. Accordingly, Microsoft is entitled to summary judgment on Counts V and VI of the complaint insofar as those claims relate to the counterfeit software distribution.

---

[7]    Microsoft refers to the UDTPA in portions of its complaint and its briefs, but failed to include a claim pursuant to the UDTPA in the complaint. This appears to be an oversight on Microsoft's part. Therefore, Microsoft is given leave to amend its complaint to add a claim pursuant to the UDTPA. We believe that summary judgment on such a claim would be appropriate if an amendment to the complaint is filed.

## C. Individual Liability of Defendant Mike Vaia for the Distribution of Counterfeit Software

Microsoft contends that defendant Vaia should be held personally liable for copyright and trademark infringement. According to Microsoft, Vaia was the sole owner, sole officer, and sole director of V3, controlled its daily operations, and had primary responsibility for V3's software acquisitions during the relevant time period. Vaia admits these facts. Moreover, Microsoft asserts that Vaia received a salary from V3 as his sole source of income and thus that his compensation was directly related to V3's success. Vaia admits that he received a salary from V3 (without additional incentives), but denies that his compensation was directly related to the success of V3 because he received no commissions.

There are two theories under which an individual may be held liable for a corporation's infringement: vicarious liability and contributory liability.[8]  See Gershwin Publ'g Corp. v. Columbia Artists Mgmt., 443 F.2d 1159 (2d Cir. 1971).  "[A] defendant is variously liable for copyright infringement if [he] has 'the right and ability to supervise the infringing activity and also has a direct financial interest in such activities.'"  Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc., 955 F.2d 1143, 1150

---

[8]    "A contributory infringer is jointly and severally liable for the infringement."  Logical Choice Computers, 2001 WL 58950, at *10.

(7th Cir. 1992). "Similarly, one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." <u>Gershwin Publ'g</u>, 443 F.2d at 1162.

Secondary liability for trademark infringement is "more narrowly drawn than secondary liability for copyright infringement." <u>Hard Rock Cafe</u>, 955 F.2d at 1150. Personal liability for trademark infringement and unfair competition is established if a corporate officer is "a moving, active[,] conscious force behind the defendant corporation's infringement." <u>Monsanto Co. v. Haskel Trading, Inc.</u>, 13 F. Supp. 2d 349, 354 (E.D.N.Y. 1998); <u>see also</u> <u>Dynamic Force v. Dynamic Force, Ltd.</u>, No. 98 C 5922, 1999 WL 342407, at *4 (N.D. Ill. May 14, 1999).

Under these standards, Microsoft has established that Vaia is vicariously liable for V3's copyright infringement. Vaia had both the right and the ability to supervise the acquisition and distribution of the counterfeit software. Moreover, he had a direct financial interest in the profits resulting from the sale of the counterfeit software because he drew a salary from V3. Vaia disputes that he had a direct financial interest in V3's success and points to the fact that he did not receive commissions. This argument fails because, as Microsoft argues, the only reasonable

inference from the evidence is that Vaia's salary depended on the success of V3. If V3 was not at least somewhat successful, Vaia could not pay himself.

However, Vaia's personal liability for trademark infringement and contributory liability for copyright infringement is another question. As stated <u>supra</u>, in order for Vaia to be liable under either theory, Microsoft must make a showing regarding Vaia's state of mind. For contributory liability regarding the copyright infringement, Microsoft must demonstrate that Vaia had <u>knowledge</u> of the infringing activity. In relation to the trademark infringement, Microsoft must show that Vaia was a "moving, active, <u>conscious</u> force" behind V3's infringement. Microsoft fails to make either showing, and indeed fails to argue this aspect of secondary liability at all.

Therefore, summary judgment for Microsoft is appropriate as to Vaia's vicarious liability for V3's copyright infringement. However, summary judgment is denied as to Vaia's contributory liability for V3's copyright infringement and as to Vaia's secondary liability for V3's trademark infringement.

## D. Damages for the Distribution of Counterfeit Software

### 1. Damages for Copyright and Trademark Infringement

Under the statutory damages provision of the Copyright Act, 17 U.S.C. 504(a), a copyright owner may elect to recover an award of statutory damages instead of actual damages for copyright infringement. Similarly, under the Lanham Act, a trademark owner may elect to recover statutory damages as well. See 15 U.S.C. § 1117(c). Microsoft has elected to recover an award of statutory damages under each Act. Microsoft may recover these damages as separate awards under each statute because the Copyright Act and the Lanham Act provide separate remedies for distinct injuries. See Nintendo of Am., Inc. v. Dragon Pac. Int'l, 40 F.3d 1007, 1011 (9th Cir. 1994); Logical Choice Computers, 2001 WL 58950, at *11.

The Seventh Circuit has stated that district courts have "wide discretion" in awarding statutory damages. Chi-Boy Music v. Charlie Club, Inc., 930 F.2d 1224, 1229 (7th Cir. 1991). The Copyright Act provides for a minimum of $750 and a maximum of $30,000 for each copyright infringed. See 17 U.S.C. § 504(c)(1). If the court finds that the infringer "was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award to a sum of not less than $200." 17 U.S.C. § 504(c)(2). The Lanham

Act provides for a minimum of $500 and a maximum of $100,000 per counterfeit trademark. See 15 U.S.C. § 1117(c)(1). If the court finds that the copyright and trademark infringements were committed willfully, a plaintiff can recover up to $150,000 per copyright and up to $1,000,000 per trademark. See 17 U.S.C. § 504(c)(2); 15 U.S.C. § 1117(c)(2).[9]

Microsoft asserts that it would be entitled to statutory damages for willful infringement of its copyrights and trademarks, but that it seeks only the maximum amount of statutory damages available for non-willful infringement. "Specifically, for Defendants' distribution of counterfeit Office Pro 2000, Microsoft seeks statutory damages of $100,000 each for each of its seven trademarks at issue and $30,000 for each of its seven copyrights at issue." (Memorandum of Law in Support of Microsoft's Motion at 12.)

Even though Microsoft is seeking only the maximum damages for non-willful infringement, we will still examine the nature of defendants' conduct in order to determine the appropriate statutory damages for the distribution of counterfeit Microsoft software. Microsoft contends that defendants' conduct was "unquestionably willful." (Memorandum of Law in Support of Microsoft's Motion at

---

[9]   Thus, statutory damages are measured per mark or copyright infringed, not per act of infringement or per counterfeit item produced.

10.)  In the Seventh Circuit, infringing conduct is willful where the defendant knows that his conduct constitutes infringement or where he shows reckless disregard of the copyright owner's rights. See Wildlife Express Corp. v. Carol Wright Sales, Inc., 18 F.3d 502, 511 (7th Cir. 1994).  The standard is similar under the Lanham Act--"willful blindness" is equivalent to actual knowledge.  See Hard Rock Cafe, 955 F.2d at 1149.

Microsoft points to several facts in order to establish knowledge, or at least reckless disregard or willful blindness. Vaia is not a novice in the software business.  He has been educated in the software business by gaining experience through various jobs in network administration and computer support, reading computer magazines, attending information technology conventions, and talking with customers and software suppliers. Vaia acknowledges that V3 had acquired counterfeit software on several occasions, so we can infer that he was familiar with the characteristics of counterfeit software. Defendants never provided Microsoft with samples of software they suspected to be counterfeit, nor did they provide Microsoft with names of distributors they believed to have distributed counterfeit software. Vaia simply relied on word-of-mouth in the industry and information about pirated software acquired from Microsoft's web

site in order to determine whether certain software was counterfeit.

Although defendants knew that there were authorized distributors of Microsoft software, defendants did not acquire software from Microsoft-authorized distributors because their prices were "too close to retail." Defendants admit that the vendors from which they acquired software did not always provide copies of invoices and appeared to be lax in recordkeeping, and were not always forthcoming about the genuineness of their software. Microsoft also points out that defendants continued to distribute counterfeit software even after the police executed the search warrant and after Microsoft sent its warning letter.[10]

While the evidence submitted by Microsoft may not give rise to an inference of knowledge, we believe that it does demonstrate defendants' reckless disregard for and willful blindness to Microsoft's intellectual property rights. Defendants' contention that they "did everything that a normal reseller would do" is unpersuasive. (Defendants' Response at 14.) Moreover, while we have held that Microsoft is not entitled to summary judgment on

_____

[10] Defendants argue that "the handful of sales occurred after the 'raid' and after Microsoft had sent V3 its 'anti-piracy' letter. To infer that V3 sold [counterfeit] software willfully under these circumstances defies all logic." (Defendants' Response at 12.) What defendants apparently mean to say is that it would have defied all logic for V3 to have continued its infringing behavior after such notice. This argument is wholly unpersuasive, considering that people frequently engage in behavior that "defies all logic."

those claims regarding defendants' conduct relating to the WWF CDs, that conduct is relevant when considering defendants' state of mind relating to the counterfeit software. The only reasonable conclusion from the facts is that defendants ordered WWF CDs from Microsoft under the pretense that the CDs were for St. Viator, and then turned around and resold those CDs at a profit. While Microsoft has not proven that this conduct constituted trademark infringement or false designation of origin, it was nonetheless deceptive conduct, and bolsters our determination that defendants' conduct regarding the counterfeit software constituted reckless disregard for Microsoft's rights.

That said, the extent of defendants' distribution of counterfeit software is unclear. Defendants make a strong argument when they distinguish this case from other cases where defendants had distributed thousands of counterfeit CDs. Here, only a handful of units were actually found to be counterfeit. We consider this fact as well in determining the amount of statutory damages to award.

We are not required to follow any "rigid formula" in setting an appropriate statutory damages figure. The Seventh Circuit has held that we may consider such factors as "the difficulty or impossibility of proving actual damages, the circumstances of the

infringement, and the efficacy of the damages as a deterrent to future copyright infringement." Chi-Boy Music, 930 F.2d at 1229. We have attempted to tailor the remedy to the facts of this case, keeping in mind that the amount of statutory damages that we award should be sufficient to deter future violations by defendants, but not unduly large considering that Microsoft suffered little, if any, actual injury. Accordingly, we will award Microsoft statutory damages of $5,000 per copyright (for seven copyrights) and $5,000 per trademark (for seven trademarks), for a total statutory damages award of $70,000.

## 2. **Costs and Attorney's Fees**

Microsoft also seeks costs and attorney's fees. Under the Copyright Act, the court "may" award costs and reasonable attorney's fees to the prevailing party. 17 U.S.C. § 505; McRoberts Software, Inc. v. Media 100, Inc., 329 F.3d 557, 571 (7th Cir. 2003). The Lanham Act provides that a plaintiff whose trademark has been infringed "shall be entitled" to recover costs and that "in exceptional cases" the court "may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). "Exceptional cases" encompass those "in which the acts of infringement are 'malicious, fraudulent, deliberate or willful.'"

BASF Corp. v. Old World Trading Co., 41 F.3d 1081, 1099 (7th Cir. 1994).

We have found that defendants' infringing conduct was willful, see supra; therefore, Microsoft is entitled to an award of costs and reasonable attorney's fees it has incurred in relation to the claims on which we are entering summary judgment for Microsoft. We request that the parties refer to Local Rule 54.3 and attempt to agree upon an amount. Any time reasonably spent by Microsoft in the Rule 54.3 process will also be compensable. In the event that the parties are unable to agree upon an amount, plaintiff should file a fee petition in accordance with Rule 54.3 and the schedule set forth in the conclusion of this opinion.

### 3.   Permanent Injunction

Microsoft seeks a permanent injunction enjoining defendants from further infringing Microsoft's software. When a copyright plaintiff establishes a "threat of continuing infringement," it is entitled to an injunction. See Olan Mills, Inc. v. Linn Photo Co., 23 F.3d 1345, 1349 (8th Cir. 1994). The Lanham Act authorizes the entry of injunctions "according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark." 15 U.S.C. § 1116(a). Thus, both statutes contemplate some showing by the

plaintiff of a threat of future infringing conduct by the defendant.

Microsoft merely argues that defendants continued their infringing conduct after the Wood Dale Police executed the search warrant. It does not submit any evidence or make any argument as to defendants' current conduct or likely future conduct. Accordingly, Microsoft has failed to establish a threat of future continued infringement by defendants, and its request for injunctive relief is denied.

**E.    Accounting and Constructive Trust**

Microsoft makes no argument in its briefs with respect to Counts VII and VIII of the complaint, which are claims for imposition of a constructive trust and an accounting. Therefore, the motion for summary judgment is denied as to those counts.

### CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted in part and denied in part. The motion is granted as to Counts I and II. It is granted as to the portions of Counts IV, V, and VI relevant to the counterfeit software, but denied as to the portions of those counts relevant to the WWF CDs. Microsoft may file a memorandum by September 10, 2003, showing

cause why we should not enter summary judgment for defendants on these counts in relation to the WWF CDs.

Plaintiff's motion for summary judgment is denied as to Counts III, VII, and VIII of the complaint.

The court awards Microsoft statutory damages of $5,000 for each of its seven registered trademarks that defendants infringed by virtue of distributing counterfeit software, and $5,000 for each of its seven registered copyrights that defendants infringed, for a total statutory damage award of $70,000. The court grants Microsoft's request for costs and attorney's fees, and the parties are directed to attempt to agree on an amount pursuant to Local Rule 54.3 and as set forth supra. In the event that the filing of a fee petition is necessary, the petition should be filed no later than September 29, 2003, and defendants may respond by October 13, 2003.

Microsoft is granted leave to amend the complaint to add a claim pursuant to the UDTPA if it wishes to do so. Microsoft may file the amendment to the complaint by September 3, 2003.

DATE:     August 27, 2003

ENTER:

John F. Grady, United States District Judge